# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
September 9, 2014 Session

## STATE OF TENNESSEE v. ANGEL GEOVANNA HURTADO

**Appeal from the Criminal Court for Davidson County**
**No. 2010-B-1624     Mark J. Fishburn, Judge**

---

**No. M2014-00180-CCA-R3-CD - Filed December 30, 2014**

---

The Defendant, Angel Geovanna Hurtado, was convicted by a Davidson County jury of three counts of aggravated child abuse, one count of reckless aggravated assault as a lesser-included offense of aggravated child abuse, and one count of aggravated child neglect. The trial court imposed an effective sentence of twenty-five years for her convictions. In this direct appeal, the Defendant contends that (1) the trial court committed plain error by failing to grant a mistrial given the "significant problems that arose during trial revealing the existence of potential new witnesses and exculpatory evidence"; (2) the trial court erred by permitting the State to elicit testimony about and argue that evidence of domestic violence established the Defendant's guilty knowledge, under a theory of criminal responsibility, of the child abuse and neglect of the victim by her live-in boyfriend; and (3) the evidence was insufficient to support the convictions, including a challenge of material variance between the proof and the State's election of offenses. Following our review of the record and the applicable authorities, the judgments of the trial court are affirmed. However, we must remand for entry of a corrected judgment in count two to reflect the proper conviction of reckless aggravated assault.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court
Affirmed; Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

Peter J. Strianse, Nashville, Tennessee (at motion for new trial and on appeal); and G. Wayne Davis (at trial), Nashville, Tennessee, for the appellant, Angel Geovanna Hurtado.

Robert E. Cooper, Jr., Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Brian K. Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
## FACTUAL BACKGROUND

On June 15, 2010, a Davidson County grand jury charged the Defendant with four counts of aggravated child abuse and one count of aggravated child neglect, all involving her infant son, A.H.,[1] and all Class A felonies. See Tenn. Code Ann. §§ 39-15-401, -402. The Defendant proceeded to trial, where the following evidence was presented.

The victim's date of birth was September 8, 2008. In June 2009, the Defendant and her infant son moved to the Antioch residence of Vicente Jesus Gonzalez, the Defendant's boyfriend; Mr. Gonzalez was not the child's biological father. Prior to the move, the Defendant lived with her parents.

On October 27, 2009, the victim was taken to Southern Hills Hospital for an arm injury; there it was determined that the victim suffered a fracture in his left arm to the humerus, a bone in the upper arm. Following this visit, the case was referred to the Department of Children's Services (DCS) for further investigation as to the cause of the child's injuries. On October 28, the following day, Tiffany Rhodes, a DCS case worker,[2] went to the address provided during the visit to Southern Hills, which turned out to be the Defendant's mother's home. The Defendant's family accompanied Ms. Rhodes to the correct location, the residence where the Defendant lived with Mr. Gonzalez. Mr. Gonzalez and the Defendant lied to Ms. Rhodes—Mr. Gonzalez provided a false identity, identifying himself to Ms. Rhodes as Jose Hurtado, the Defendant's brother, and they then stated that the residence belonged to Mr. Hurtado.

The following conversation transpired:

Jose Hurtado[3] stated he was the brother of [the Defendant], he stated he did not witness the child falling. He stated that he works late in the evening and when he get[s] home in the morning, he goes to sleep. He stated that he awoke around 12:30 p.m., and [the Defendant] explained to him about [the victim's] falling. He stated that [the victim] looked fine and was asleep. He stated that

---

[1] It is the policy of this court to refer minor victims by their initials.

[2] Ms. Rhodes was no longer employed with DCS at the time of trial. She was unable to be located, and her report was read into evidence by the custodian of records.

[3] Really Mr. Gonzalez was the declarant.

-2-

Southern Hills Medical explained that [the victim] had a strain in his left shoulder and a break in his left arm and sent the family home.

According to Ms. Rhodes's notes, she spoke with the Defendant in English that day. Also, the use of an interpreter was not mentioned during the conversation with either the Defendant or Mr. Gonzalez.

Following the interview with Ms. Rhodes, the child was taken to Vanderbilt Children's Hospital for further observation. Once there, the victim was initially seen by Vanderbilt Pediatric Primary Care for assessment of the fracture to his left humerus bone. The record from Pediatric Primary Care, entered as an exhibit, reflects that the Defendant, her brother, and a case worker were present with the victim when they arrived at the hospital. The history provided in that record states: "seen yesterday at So[uthern] Hills E[mergency] D[epartment and] diagnosed [with left] humerus fracture (after falling on an outstretched arm per mom). DCS involved [due to] possible spiral [fracture] of arm. Cont[inues] to be active [and] playful." The victim was then referred to Dr. Neil Green, a qualified expert in the field of pediatric orthopedic medicine and child abuse.

According to Dr. Green, a "hospital-based translator" was used to facilitate the conversation between himself and the Defendant. The Defendant provided the following explanation for the victim's injury to Dr. Green: "She told me that [the victim] was [thirteen]-months . . . and was just beginning to learn to walk, and she was helping him walk and he fell." According to Dr. Green's trial testimony, he took this statement to mean that the victim "fell on an outstretched arm[,]" but the Defendant made no mention of the victim's falling from a step or any height. However, Dr. Green authored the following statement after completing his evaluation of the victim, which was admitted as an exhibit: "The injury ([left] humerus [fracture]) is consistent with the story the mother gives as an explanation to his injury. Mom states [the victim] fell with an outstretched [left] arm down [one] step. This [left] humerus [fracture] can happen with this incident." Based upon Dr. Green's initial conclusion, no additional X-rays were taken of the victim that day.

At trial, Dr. Green clarified his conclusion regarding the left humerus injury:

> Fractures of the humerus, again the bone in the upper arm, do not occur in children below the age of [twelve] months as a result of accidental trauma. So whenever we see a young child with a fracture of the humerus, who is a non-walking child, we immediately feel that that is the result of non-accidental trauma until we can prove it otherwise.
> This particular child was [thirteen] months of age and was just beginning to walk, and the mom said that the child had fallen. I felt that was

a possible explanation, but I was concerned about non-accidental trauma. The child was beginning to walk, he had been seen by DCS or Child Protective Services, and had also been seen by pediatricians at Vanderbilt and there were no red flags raised so I didn't investigate this further.

Dr. Green testified that he did not have the benefit of the Southern Hills medical record or photographs of the steps outside the Defendant's residence at the time he made his initial conclusion.

Dr. Green was asked to further describe the victim's humerus fracture, stating that "[m]ost likely it's the result of some rotation or twisting injury." He continued,

The bone itself can't rotate. The way the fracture could occur would be some rotation of the entire arm, probably with the elbow somewhat bent. A child could sustain a fracture like this with a fall on the arm, and then the body rotates around that arm that is fixed. It is unlikely in a young child of this age because their body mass is not quite large enough to do that, but in an older child that is how that would occur.

Dr. Green opined that, if a person "violently" grabbed a child by the forearm and twisted it, then an injury like this one could occur. Stated another way, "this requires a fair amount of force in order to cause [this] particular injury[.]" According to Dr. Green, an injury like this one "causes a significant amount of pain[,]" and a child would be "more than crying, [would be] screaming." Following this fracture, "[a]ny motion of that arm [would] cause significant pain to [a] child until the arm [was] put at complete rest with a cast or a splint."

Prior to trial, Dr. Green was able to review the medical record from Southern Hills Hospital pertaining to the victim's visit on the preceding day, October 27, 2009. Dr. Green recalled that facility's notes said that the parent was unable to provide an explanation of how the injury occurred to the victim. The documentation from Southern Hills also "suggested that, [p]arent states that when they woke up this morning unable to move the left shoulder and cried when moved shoulder was what prompted them to bring the child to the hospital[.]" Based upon this history, Dr. Green opined that the injury would have had to occur sometime the day before.

Dr. Green stated that delay by a parent in seeking medical treatment was "a red flag" from the standpoint of a child abuse assessment and that a change in story about the cause of an injury was also "a red flag." According to Dr. Green, if he had known this information—that the Defendant delayed in seeking treatment until the following day and that she changed her story about the cause of the victim's initial injury from October 27

-4-

(when none was provided) to October 28 (when she stated that the victim fell on outstretched arm)—he "would have investigated this child for non-accidental trauma and would have done every examination that [he] felt was necessary."

Dr. Green saw the victim for a follow-up visit on November 4. According to Dr. Green, the victim's "arm was fine, the bone was in good position[,]" on this occasion. He did not receive any information at that time that caused him additional concern for the victim's welfare.

The victim was seen again by Vanderbilt Pediatric Primary Care again on November 11 for head swelling, but he was then referred to the emergency department for a "full workup[.]" He was seen there by Dr. Andrea Bracikowski, a Vanderbilt Children's Hospital orthopedics doctor, who employed a translator to speak with the Defendant. Both the Defendant and the victim's uncle were present with the child, according to Dr. Bracikowski. Dr. Bracikowski asked the Defendant "if there was any reason for why [the victim] had swelling on his head[,]" and she stated that "he fell while walking outside, hitting the side of his head."

A CT scan was ordered and showed "a bilateral skull fracture." Additionally, swelling was visible on the CT scan: "most likely where the blunt trauma . . . occurred to his head, something hit him on the side of his head." According to Dr. Bracikowski, a "significant amount" of scalp swelling would have started "immediately or nearly immediately" after this "traumatic injury" to the victim's head, not three or four days later. Dr. Bracikowski described the fracture as "clearly a large skull fracture right on the side of his head that must have caused a significant amount of pain" and that the caregiver would have been aware of that pain. She further explained that the fracture "went from one side of the [victim's] head to the other side of the . . . head," crossing over a "suture line[.]" She opined that "to go all the way across and cause a fracture on the opposite parietal bone is very unusual and a nasty fracture[,]" and continued, "A tremendous amount of force was delivered bluntly to this child's skull." According to Dr. Bracikowski, it was "[h]ighly unlikely" that running into a wall could have generated sufficient force to cause this injury. She was asked,

> Assuming the child was in a walker, fourteen-months old, the child in an attempt to get out of the walker, get[s] somewhat on top of it, he obviously would have to have climbed up to a certain height, and in that attempt to get out of the walker, that child tumbles out and hit[s] his head on a thick glass table, on the end of a thick glass table tumbling down and crashing on the bottom of the table's leg, could that height, from that type height, could an injury, a severe [head] injury occur if that had been the case?

to which she responded in the affirmative. Dr. Bracikowski also agreed that "some children . . . have a higher degree of tolerance for pain than others[.]"

The MRI (Magnetic Resonance Imaging) showed that the victim further suffered an epidural hemorrhage in his brain, which is a small area of bleeding between the skull and the brain. Dr. Bracikowski explained, "Epidural hematomas of the arterial type are very dangerous and life-threatening and there are many cases of patients coming in, they seem fine from their head and then they die." The victim was admitted to the hospital and placed under observation. If the parents waited three to four days following the head injury to seek treatment, this "absolutely" could have caused further injury to the victim, according to Dr. Bracikowski. "[I]n almost every circumstance, the parent or caretaker" would have taken the child immediately "somewhere to seek medical care" with this bad of a fall.

Also, a complete skeletal survey was performed. Dr. Bracikowski stated that it was her practice to keep the family members informed of the results of the X-rays. In addition to the previous humerus fracture and new skull fracture, older fractures to the victim's right ulna and left tibia were seen on the skeletal survey. "There were no outward signs for those injuries[.]" According to Dr. Bracikowski, these two fractures "were not the exact same age"; "the tibia fracture had a lot more healing[.]" Dr. Bracikowski opined that the "fracture of just the ulna implies . . . there was force": "The child put up his arm to defend himself from being hit and was struck in the ulna, that's not a classic fracture of a child who falls or a child who, you know, just accidentally twists their arm, whatever, that is a defensive wound." Dr. Bracikowski further stated, "[I]f a child's had enough force applied to a bone, either an arm or leg to cause a fracture, that child had to cry, had to have swelling, maybe bruising, not using that arm, limping, . . . if that child had a tibia fracture, that should be limping . . . ." It was possible one of these additional fractures might have appeared on a skeletal survey if one had been conducted on October 28, the child's first visit to Vanderbilt with Dr. Green.

Dr. Bracikowski also described the prior humerus fracture as "very unusual" for a fall on an outstretched arm in a child this age, due to its "twisting" nature; and she had never seen such an injury before in a child this young. She opined that the history provided by the Defendant was inconsistent with this type of injury.

In conclusion, she stated that the victim's four fractures were "[m]ost likely" all caused by "different mechanisms" and at "different points in time[.]" Her "diagnosis was that this was all consistent with non-accidental trauma."

Sometime during the evening of November 11, Alissa Libonn, a Vanderbilt social worker in the emergency department, spoke with the Defendant and the male who

accompanied her to the hospital, who was identified to Ms. Libonn as the mother's brother, Jose Hurtado, also the victim's uncle. Ms. Libonn's notes indicated that she was being assisted by an interpreter, a Mr. Gregory Garcia. The uncle reported to her the following:

> [T]he child and the mother lived with him, and I don't know if it was his wife or significant other, but they were referred to as that child's aunt. . . . [T]hey noticed that the child's head was swelling on that Sunday, and I don't have that date. It was unclear to me at that time, from what he was telling me, if medical attention had been sought at that time when they noticed the swelling.
>
> The uncle reported that they were sent by the child's pediatrician to the Radiology Department at Vanderbilt this afternoon for further testing.

The mother stated to Ms. Libonn that the child did not attend daycare, that she was the child's primary caregiver, and that the child was sometimes in the care of his grandmother.

Thereafter, according to Ms. Libonn's documentation, "the medical team from the emergency room came and explained to the mother and to the uncle that they had found some additional injuries" and that the Department of Children's Services would be contacted. The Defendant was unable to provide any explanation to Ms. Libonn for any of the victim's various fractures.

Both Dr. Bracikowski and Ms. Libonn stated that, if a child presented to the hospital with head swelling, it was not emergency department protocol to refuse to treat that child. Such a practice would expose the hospital to potential liability.

Because child abuse was suspected, a "CARE Team" assessment was ordered. Dr. Kecia Nicole Carroll, a Vanderbilt pediatrician, spoke to the Defendant on Wednesday, November 11, with the assistance of an interpreter; no other family members were present. The Defendant provided the following explanations of the victim's injuries to Dr. Carroll:

> Regarding fracture of [left] humerus:
>
> MOC[4] reports [the victim] was doing well until approximately [two] weeks ago Tuesday at about 11 in the morning. MOC reports she was outside of their home with [the victim] and he was playing. MOC reports through interpreter "He was wanting to walk and he went to fall, and before he fell he put his arms in front."
>
> When I asked where he was outside, MOC reported "outside by a step with me. By the step of the apartment." When I asked MOC to tell me more

---

[4] The Defendant is referred to as MOC, meaning mother of child, in Dr. Carroll's report.

about the fall, MOC reported through the interpreter "He had toys he wanted to grab and before he did it he fell." When I asked what he fell on, MOC reported "He fell on the pavement." When I asked what he was standing on, MOC reported "He was not standing on anything." When I asked how he acted after the fall, MOC reported "He did not cry or anything. I didn't notice until the next day that he could not move his arm." When I asked how he was during the rest of the day, MOC replied, "He was fine, like always, playing." When I asked if he was eating okay and moving arms and legs okay, MOC replied, "Yes, he was moving them but he could not turn his arm."

. . . .

Regarding cephalohematoma [scalp swelling]:

MOC reported through interpreter, "Sunday I noticed that the right side of his head was inflamed. I called Monday and they said they did not have appointments. Called Tuesday and they gave me an appointment today."

When I asked MOC how [the victim's] head got hurt, MOC replied "On Sunday, he does not like to take a shower, when he was about to take a shower he started running and he hit his head on the wall." "After that he was fine like always." When I asked if he had any crying, vomiting, or deceased alertness, MOC replied no except "on Tuesday he took some milk and threw up at night."

When I asked about what time [the victim] hit his head on the wall, MOC reported, about 6:00 o'clock at night on Sunday.

When I asked how MOC had come to first notice his head swelling, MOC reported "Well, my brother noticed it. He felt his head and said it was swollen." When asked what time it was that MOC's brother noted swelling, MOC replied about "11 at night. He plays with [the victim] when he comes home from work."

When asked if [the victim] had been alone with anyone else on Saturday or Sunday, MO[C] reported he was always with her. MO[C] denied that [the victim] was out of MOC's care.

When asked, MOC reported that [the victim] did not have any other known trauma, falls, or car accidents. MOC reported that [the victim] did not have any other history of having broken bones or having been in a cast.

Dr. Carroll stated that the Defendant's explanation for the left humerus fracture was inconsistent with the nature and severity of the injury. Dr. Carroll believed that the victim would be in pain after fracturing his arm in this way, which would have continued until the arm was immobilized, and that the victim would have been unable to use his arm "normally after the injury[.]" If the injury occurred the day before taking the victim to the hospital, and the victim was not seen at Southern Hills until 2:00 p.m. the next day, Dr. Carroll opined,

-8-

"Well, if a child had a fall, seeking medical care immediately is typical after an accident. When there is a delay in care, that is concerning that it was non-accidental injury."

According to Dr. Carroll, in addition to the cephalohematoma, the X-rays showed that the victim suffered an epidural hemorrhage in his brain; however, a follow-up MRI did not reveal a brain clot. The victim was placed under observation. Dr. Carroll did not believe that the running into a wall was a reasonable explanation for the skull fracture due to the severity of the injury. Also, according to Dr. Carroll, scalp swelling would have "start[ed] soon after[]" the injury, not three or four days later. The Defendant never provided any explanation regarding the ulna or tibia fractures to Dr. Carroll. Dr. Carroll opined that "it would be hard to imagine [one incident] that would explain all of" the victim's various fractures.

The social history provided by to the Defendant to Dr. Carroll was as follows: "People living in the home: Mother; Jose Hurtado, uncle (mother's brother), 33 years; Janet Hurtado, Jose Hurtado's wife, 32 years; Daphne Hurtado, Jose Hurtado's daughter, 14 years." The Defendant did not indicate any other occupants of the home and never mentioned a boyfriend by the name of Vicente Gonzalez.

Dr. Carroll was "very concern[ed]" that the injuries were "non-accidental" given the number of fractures, a history that was insufficient to explain their cause, and the different ages of the injuries. Dr. Carroll asked the Defendant if the victim "had been alone with anyone on Saturday or Sunday" when the victim sustained the head injury. The Defendant reported that the victim "was always with her" and "denied that [the victim] had been out of [her] care." Also, the victim was "developing normal[ly,]" had no bone disease predisposing him to fractures, and was a happy, playful child, according to Dr. Carroll. He also did not have any additional bruises or marks other than at the fracture areas. After finishing her assessment, Dr. Carroll recommended that DCS continue to investigate, and the victim was placed in DCS custody.

Around 8:30 on the evening of November 11, Detective Don Long with the Metro Police Department Youth Services Division[5] also spoke with the Defendant and Mr. Gonzalez, who still identified himself as Jose Hurtado, in Vanderbilt's Emergency Department. He documented that he was assisted by a translator, Mr. Gregory Garcia, in interviewing the Defendant. The Defendant appeared to understand what was going on and responded appropriately to Det. Long's questions. He believed that "the other gentleman [in the victim's room] ended up speaking English."

---

[5] At the time of trial, Det. Long was no longer employed as a police officer.

Det. Long asked the Defendant about the victim's injuries, if there was "anything she could think of that could have happened to this child," and the Defendant explained, "about three weeks ago that she was at her mother's house, [and the victim had] fallen off her mother's bed." The Defendant stated that the victim was crying but did not mention any other change in his mental status, as might occur with a head injury. Det. Long later asked the Defendant about the prior humerus fracture, and the Defendant stated that the victim "fell off outstretched arm down from one step." The Defendant told Det. Long that she was always present with the child. Det. Long did not observe any physical signs of abuse upon his visual examination of the child; however, he had investigated cases of "non-accidental trauma with fracture injures where there [were] no outward signs of trauma[.]" Following Det. Long's interview of the Defendant, he was advised by the translator that the Defendant had provided conflicting accounts about the cause of the victim's injuries.

Det. Long also interviewed Mr. Gonzalez, with Ms. Rhodes present. Ms. Rhodes's report indicated the following took place during the interview:

> CM[6] accompanied Detective Long as he interviewed alleged brother of [the Defendant], Mr. Vicente Gonzalez stated that his real name is not Jose Hurtado, and it was Vicente Gonzalez. He stated he wanted to apologize to CM Rhodes for not being truthful of his true identity. He stated that he was told to lie about who he really was because the grandmother, Maria Hurtado[] wanted to use him for insurance for the children and also afraid of [the victim's] being taken away from the family on 10/27/09 for the first DCS investigation where [the victim] was falling and hurting his left arm. Mr. Gonzalez stated that he does not know how the child obtained the injuries to his body. He stated that he leaves for work every day around 2:00 p.m, and returns home around 12:00 a.m. in the morning and goes to sleep. He stated that he worked for Standard Candy, but today was his last day. He stated that [the Defendant] has been his girlfriend for three weeks and now she is pregnant with [their] first child. He stated both [the victim] and [the Defendant] have been living with him. When he goes to work, [the Defendant's] family comes to his apartment, stays there all day, when he comes home, they would be gone. He stated that [the Defendant] always watches the baby and he has never seen her hurt the child and was very caring with [the victim]. He stated that [the victim] was like his child also and she is pregnant with his child now. He stated that he did not want to get in trouble with the police and that was very serious of [the victim's] being hurt. He stated that [the Defendant] has a real brother named Jose Hurtado.

---

[6] The designation CM identifies Ms. Rhodes.

According to Det. Long, Mr. Gonzalez expressed concern about the Defendant's telling him lies on prior occasions, and Mr. Gonzalez came forward to tell the truth in an effort to avoid trouble with the police.

Gregory Garcia, a medical interpreter for Vanderbilt Hospital, testified that he recalled translating on November 11, 2009, for the "team" in an effort to facilitate conversations with the Defendant while inside the victim's hospital room. He stated that he did not "have any difficulties in translating or communicating" that day. He could not recall specifically whether he was involved in a conversation with a police officer and the Defendant. He did recall alerting someone to the fact that the mother had provided different stories for the child's injuries. He also recalled that a "mid-20s" male was present with the mother at the hospital, who appeared to be "a relative of the mother" at that time.

The victim again came to Dr. Green's office on November 30, 2009, and "the [left humerus] fracture was healed[.]" However, during this visit, Dr. Green "realized that the child had been seen in the emergency room on the 1[1]th[7] of November because of a complaint of swelling in the head -- on the head. He was X-rayed and the child had a skull fracture." Dr. Green also reviewed the skeletal survey of the victim performed on November 11. He observed a skull fracture "towards the back of the head." This fracture was "bilateral[,]" meaning it was "present on both sides of his head." Dr. Green opined that it would have taken a "fairly significant blow" to have caused this injury. Dr. Green stated that the fracture had "crossed over . . . a suture line[,]" indicating that it was "more likely . . . a fairly significant" and "non-accidental injury." The emergency room note indicated that the victim was brought in that day due to "scalp swelling" in the area of the fracture, indicating to Dr. Green that the skull fracture was "[m]ore recent."

Dr. Green further determined that the victim had two additional fractures on the November 11 X-rays—one of the right ulna, a bone in the forearm, and the other of the left tibia, the "shin bone" in the lower leg. Dr. Green described these both as "healing fracture[s]." He further opined,

> It also appeared to me in looking at the X-rays that the ulna fracture was older than the tibia, the leg fracture, because there was more healing on the ulna fracture. I also looked at the skull fracture, which was brand new and acute, but we had a child who had . . . fractures . . . that occurred at different times.

---

[7] The X-rays are frequently referred to as the November 13 X-rays during Dr. Green's testimony; however, the correct day is clearly November 11.

Dr. Green elaborated, "It is exceedingly common . . . to see fractures in children that don't show up initially but will eventually once we start seeing healing." Also, the victim did not have any type of disorder or anything else that made him prone to fracture injuries, according to Dr. Green.

Dr. Green stated that the tibia fracture was "less than two weeks old" "because it takes seven days at minimum, seven to ten days, in a child of this age for the X-ray to show the fracture, show the healing." Dr. Green opined that this injury to the victim's left tibia "would have [had] to occur by a separate mechanism from any of the other fractures that [were] identified in the child's body[.]" If he had performed a skeletal survey on October 28, he likely would not have seen this injury because "the fracture [did] not look as though it . . . had enough healing . . . to be able to be seen" on an X-ray at that time.

Dr. Green then testified about the right ulna fracture, stating that this fracture was "older than the healing" seen in the tibia fracture and, thus, "occurred at an earlier time." He opined that this fracture was "more than two weeks old" and, again, that this injury occurred "by a separate mechanism from the other fractures in the child's body." It was possible that the fracture could have been seen on a skeletal survey, if one had been conducted on the victim on October 28.

Dr. Green was asked about whether the victim would have suffered pain from these three fractures to the skull, the tibia, and the ulna, to which he replied, "Absolutely, it would have hurt." He further stated that "a caretaker [would] be aware that something had occurred to cause that child to be in pain[.]" He stated, to a reasonable degree of medical certainty, that all four of these fractures were the result of non-accidental trauma, basing this diagnosis on the following:

> The child was only [thirteen] months of age and would not have been able to sustain these injuries on his own, and the skull fracture was the result of significant force. Our diagnosis for non-accidental trauma is the age of the child, and this child fits the age group, and fractures that occurred at different times. So this child had . . . four fractures that had occurred at different times, and that make[s] the diagnosis of non-accidental trauma.

He acknowledged that he was revising his previous opinion of the fracture to the left humerus made following the October 28 visit. Lastly, he stated that explanations offered by the Defendant—that the child had fallen off of a couch onto a floor, had run into a wall and struck his head, or had fallen off of a bed onto a floor—were not sufficient to explain the skull fracture that occurred to the victim.

On cross-examination, Dr. Green was asked about another explanation given by the Defendant for the skull fracture: "that the child had fell out of a walker onto a glass table, striking his head, and tumbling down and hitting the leg of that table -- he fell and hit his head first, and then tumbled down and hit his head[.]" Dr. Green responded that the fracture was "probably not the result of a simple fall, even a fall from a small height."

On October 28, Dr. Green did not observe any bruises or additional marks on the victim, other than the swelling associated with the humerus fracture. He appeared "healthy" and "well-nourished[.]"

Members of the Defendant's family and Mr. Gonzalez were also called as part of the State's case-in-chief. The real Jose Hurtado, the victim's uncle, testified that his sister never lived with him in 2009, that he was not present at Southern Hills Hospital on October 27, 2009, that he never went to Vanderbilt Children's Hospital while the victim was hospitalized in November 2009, and that he never had any conversations with doctors, hospital personnel, social workers, or police about the victim's injuries. Jose[8] was not aware of the victim's injuries until later, and the child always appeared "very healthy" and had "a lot of energy," according to Jose. Jose further testified that the victim lived with another brother following his release from Vanderbilt in November 2009, and to Jose's knowledge he had not suffered any additional fractures since that time.

Jose stated that he and his family members were "very close," interacting with one another frequently. The victim was sometimes "taken away . . . for a couple of days" to spend time with his grandmother; Jose said the victim was sometimes in the care of him and his wife; and the family visited Chuck E. Cheese entertainment center on occasion, the victim included. However, Jose could not report that the victim sustained any serious injuries while in that care of anyone other than the Defendant. According to Jose, the Defendant and Mr. Gonzalez were still having a romantic relationship, despite the Defendant's incarceration. He did not think his sister was "an abusive person to her child" and believed that his sister was the type of person to seek immediate medical attention if the victim suffered a serious injury.

Maria Hurtado, the Defendant's mother and the victim's grandmother, testified that she sometimes took care of the victim for the Defendant, whom she described as "very active." However, she could not recall any injuries to the victim while in her care. Maria testified that she never told Mr. Gonzalez or her daughter to lie about Mr. Gonzalez's identity at the hospital. According to Maria, the Defendant still received mail at her residence,

---

[8] We will refer to some of members of the Hurtado by their first names for the sake of clarity; in so doing, we intend no disrespect.

although she no longer lived there. Maria stated that Alexis Vasquez, the Defendant's young nephew, interpreted during the interview with Ms. Rhodes, and that he did so at Ms. Rhodes's request "because nobody there spoke English." However, according to Maria, Alexis was not very fluent himself in English. She believed her daughter was "innocent[,]" that any injury to the victim was an accident. Maria also testified that the victim was in the care of other family members "from time to time" for outings, such as to Chuck E. Cheese.

Vicente Gonzalez testified and gave a much different account than that previously provided by the social workers, hospital staff, police, and doctors. Regarding the victim's arm injury, Mr. Gonzalez testified that the victim could not "lift his arm" on the morning of October 27, 2009. According to Mr. Gonzalez, the Defendant did not mention any problem with the arm before going to bed on the prior evening, and the victim "was perfectly fine" when he left for work early the next morning. When Mr. Gonzalez returned home from work, the Defendant told him "the baby was starting to walk and that he slipped and fell on top of his arm outside the apartment." They went to the hospital shortly thereafter, taking time only to change the victim's clothes before getting in the car.

They arrived at Southern Hills Hospital around 2:00 p.m. in the afternoon, and this visit lasted about six hours, according to Mr. Gonzalez. Mr. Gonzalez stated that the medical personnel at Southern Hills gave the victim some medicine, put a sling around the victim's arm, and sent them home. He stated that neither he nor the Defendant were told during this visit that the victim's arm was in fact fractured.

According to Mr. Gonzalez, he did not speak English very well, and the Defendant only spoke Spanish. Mr. Gonzalez was asked about a Southern Hills Hospital record that indicated that the victim "woke up that morning not able to use his arm" but did not mention anything about the victim "falling with his arm out outside the house that day[.]" He could not provide an explanation other than his inability to speak English well.

Mr. Gonzalez confirmed that Ms. Rhodes came to his house the following the day and interviewed them for approximately fifteen to twenty minutes, investigating about possible child abuse. According to Mr. Gonzalez, the Defendant's young nephew translated during the interview with Ms. Rhodes. Mr. Gonzalez said that he did not tell Ms. Rhodes that he was the Defendant's brother, Jose Hurtado, and if she said otherwise, then she was mistaken due to the translation. Also according to Mr. Gonzalez, Ms. Rhodes never told them that the victim's arm was fractured.

Following Ms. Rhodes's visit, the couple took the victim to Vanderbilt Children's Hospital for further treatment. According to Mr. Gonzalez, the couple was "already planning on going" to Vanderbilt before Ms. Rhodes arrived because "[i]t just didn't seem like it was

enough what [Southern Hills] had done for him there[.]" Ms. Rhodes followed them to Vanderbilt "to make sure everything was all right." Mr. Gonzalez testified that he was with the Defendant during the entire trip to Vanderbilt, that he never advised anyone he was the victim's uncle, and that other family members were present at the hospital that day.

Mr. Gonzalez stated that they were finally informed of the arm fracture once at Vanderbilt and that the Defendant explained to the doctor that the injury occurred when the victim "had fallen while walking and put his arms out[.]" Mr. Gonzalez was specifically asked, "Did you do anything to cause that fracture to [the victim's] left arm?" He replied that it was "impossible" because he was at work and further confirmed that the Defendant had always said she was present when that injury occurred.

Mr. Gonzalez was then asked about the victim's head injury. According to Mr. Gonzalez he first felt "a little bump on his [victim's] head" one day in November when he returned home from work. He said that they took the victim to Vanderbilt Emergency Room "immediately[,]" that they were informed of the head injury and swelling, but that Vanderbilt refused to see the child because he "looked fine" and already had "an appointment scheduled for a physical." Mr. Gonzalez stated that it was at least two more days before the victim saw a doctor.

Mr. Gonzalez described how the head injury occurred: "Well, what happened was one time we left him on this little walking contraption that he has, and she went to get the milk bottle and -- but I didn't know he could get out of that thing, and he got on the sofa and then fell." According to Mr. Gonzalez, neither he nor the Defendant actually saw the victim fall; they "just heard him crying." Mr. Gonzalez described, "[The victim] wasn't a rambunctious run-around and climb all over the place kind of kid in November of 2009[.]" Mr. Gonzalez said that it was "three or four days" following this fall before he felt any swelling on the victim's head. Once admitted to the hospital, DCS came and took the child, and they were never informed of the victim's skull fracture. They hired an attorney the next day, who then informed them of the fracture.

Mr. Gonzalez denied that he told Alissa Libonn that he was Jose Hurtado. He did not dispute that the couple did not provide any explanation for the victim's injuries to Ms. Libonn.

When asked about the Defendant's statement that this happened when the victim ran into a wall, Mr. Gonzalez clarified that the Defendant stated that the injury "probably" could have happened that way and agreed that the victim often would "get mad and would throw himself backwards" hitting a wall, this occurring during the relevant time period. Also, the Defendant told Mr. Gonzalez that the victim had fallen off her mother's bed several weeks

-15-

before when "he just threw himself backwards"; however, there was no injury from that incident according to Mr. Gonzalez.

Mr. Gonzalez was asked about his interview with Det. Long, and he denied many of the statements that were attributed to him during that interview—he never said he was Jose Hurtado and did not make any apology for misrepresenting himself as such, and he denied saying that no one else ever watched the victim or that the Defendant had "been lying to [him] on different occasions." He confirmed that he never told Det. Long about the victim's fall from the couch, explaining that he "didn't imagine it would cause something like that[.]"

On cross-examination, Mr. Gonzalez confirmed that he was at work during the humerus injury, and the Defendant called him and told him "that the child had fallen and hurt his arm" and needed to go to the hospital. The Defendant did not drive according to Mr. Gonzalez. He stated that they arrived at Southern Hills about one hour after the Defendant called him; he believed that they "acted as quickly as possible" to get medical treatment for the victim.

Mr. Gonzalez stated that there was no interpreter present at Southern Hills and that he communicated effectively enough to hospital personnel that day to inform them of how the child hurt his arm. He also stated that the Defendant's nephew continued to interpret for them with Ms. Rhodes after they arrived at Vanderbilt on November 11. He stated that Ms. Rhodes conducted her interview with both of them in the hallway of the hospital. He further claimed that "a lot of the time" there was no interpreter present at Vanderbilt and that he did the interpreting.

Mr. Gonzalez testified that he had never seen the Defendant commit any act of abuse against the victim and averred that she took good care of the victim. He further stated that the Defendant spent a lot of time with her family, that the family was close, and that sometimes the victim's grandmother or aunts and uncles took him and cared for him.

Mr. Gonzalez stated that they were both present when the victim fell and hurt his head in the living room but that neither of them actually saw it because they were in the kitchen. The Defendant was preparing a bottle for the child, and he was sitting at the kitchen table. According to Mr. Gonzalez, this was the first time the victim had ever gotten out of the walker, and there was a glass table in the living room, which was "rather thick[.]" When the victim started to cry, the Defendant ran and picked him up to make sure he was okay. According to Mr. Gonzalez, the victim "cried a lot, but when she gave him the baby bottle[,] he calmed down." Mr. Gonzalez stated that there was "no blood, nor bruise, or like a bad bump" on the child's head, that "the child was normal[,]" and that they "had no reason to expect any serious head injury[.]"

-16-

He reiterated that it was "two or three days after the accident" before he noticed a bump on the child's head. According to Mr. Gonzalez, he made several calls to Vanderbilt "because when [he] went the first time they wouldn't see [him]," so "[he] called about four or five more times before they made an appointment for [him]." He stated that it took "three or four days" before they were seen by Vanderbilt, which accounted for the delay in treatment.

Finally, Mr. Gonzalez testified the he did not know about any of the other fractures or how they might have occurred. He further averred that the victim never cried "a lot" in his presence while holding his arm or leg.

At the conclusion of the State's proof, the State made the following election of offenses:

> Count one of the [i]ndictment alleges an act of aggravated child abuse committed against [the victim], (D.O.B. 9/8/08), and refers to the following conduct: the [D]efendant caused the spiral fracture to the left humerus of [the victim] on or about October 26, 2009.
> Count two of the [i]ndictment alleges an act of aggravated child abuse committed against [the victim], (D.O.B. 9/8/08), and refers to the following conduct: the [D]efendant caused a fracture to the right ulna of [the victim] on a day in October 2009.
> Count three of the [i]ndictment alleges an act of aggravated child abuse committed against [the victim], (D.O.B. 9/8/08), and refers to the following conduct: the [D]efendant caused a fracture to the left tibia of [the victim] on a date in late October 2009 through November 4, 2009.
> Count four of the [i]ndictment alleges an act of aggravated child abuse committed against [the victim], (D.O.B. 9/8/08), and refers to the following conduct: the [D]efendant caused a bilateral skull fracture to [the victim] on or about November 8, 2009.
> Count five of the [i]ndictment alleges an act of aggravated child neglect committed against [the victim], (D.O.B. 9/8/08), and refers to the following conduct: the [D]efendant neglected the welfare of [the victim] on diverse dates between October 1, 2009 through November 11, 2009 resulting in multiple fractures injuries, an epidural bleed in his head, a cephalohematoma, and the [D]efendant delayed seeking medical attention for these injuries.

The Defendant then testified in her own defense. Prior to moving in with Mr. Gonzalez, she lived with her parents and received mail there, including information regarding the victim's insurance. According to the Defendant, the victim was nine months old and had

never had any health problems prior to moving in within Mr. Gonzalez in June 2009. She was eighteen years old at that time.

The Defendant testified that about a month after she moved in with Mr. Gonzalez, he began hitting her. He had also assaulted her at her parents' house when they were not home. The abuse began by Mr. Gonzalez's "squeezing" the Defendant's arms "hard" and refusing to let go and escalated to his "hitting [her] with his fist in [her] face[,]" and throwing her against a wall while choking her "very tightly with his hand." The abuse left multiple injuries, according to the Defendant. During one episode, Mr. Gonzalez retrieved a knife and placed the knife in her hands, put his hands underneath hers, and said that the "only way that he would leave [her] alone" was for her to kill him. She stated that she received a "small" cut on this occasion.

The Defendant confirmed that she never reported any of the domestic abuse, although incidents happened daily "towards the end." She stated that she was afraid of Mr. Gonzalez, who had threatened to take the victim and return to Mexico. One time she threatened to leave Mr. Gonzalez, he took her phone from her so that she could not call any of her relatives anymore. She was able to tell her sister-in-law, Jeannette Castro, about the abuse, calling her sometimes during the abuse.

When asked how Mr. Gonzalez treated the victim, the Defendant said that sometimes Mr. Gonzalez "would play very roughly" with him. She elaborated, "He would grab him by the head and pick him up, he would grab by the arms and pull him by the arms. And other times he would turn him over, he would grab him by his legs and pull him by the legs." She protested to this rough play, which happened several times; however, she never observed Mr. Gonzalez hit the victim "out of anger[.]"

According to the Defendant, on the day prior to taking the victim to Southern Hills, where the left humerus fracture was discovered, she saw Mr. Gonzalez "playing with him and he was lifting [the victim] from his arms." She described, "He picked him up by both arms" and "jerked him up[,]" lifting the child over his head. The Defendant said that the victim did not cry from this but instead "kept on playing." She stated that she followed her regular routine until the following morning when the victim awoke and "couldn't lift his arm." Using her cell phone, the Defendant called Mr. Gonzalez, who was at work, and they went to Southern Hills hospital when he got home that day; all of which took about an hour, according to the Defendant. She confirmed that she lied at Southern Hills about the cause of the victim's injury and stated that she did so because Mr. Gonzalez, whom she feared, had told her to say the victim fell on his outstretched arm.

When Ms. Rhodes arrived at the Defendant's home the following day, her nephew, Alexis, interpreted for her, although he did not speak English very well. The Defendant stated that they gave her parents' address at Southern Hills "because the medical care for [the victim] had the address of my parents." According to the Defendant, questions were often repeated during this conversations with Ms. Rhodes.

Once at Vanderbilt on October 28, 2009, the Defendant claimed to repeat the same story to the medical professionals: "I had taken the boy out for a walk and he had fallen." Mr. Gonzalez was with her at the hospital that day and instructed her to continue with the initial story. The Defendant claimed that Alexis continued to interpret for her with Ms. Rhodes but agreed that an interpreter was present when she spoke with Dr. Green. According to the Defendant, following the victim's examination on October 28, Dr. Green "explained to [her] what was wrong with the child[,]" and Ms. Rhodes told them that they could go home, "that the doctor had said it was an accident."

The Defendant was then asked to explain how the victim injured his head. She replied,

> That day, Vicente arrived, it was 7:30 at night, I was waiting on him to get there so I could go in to bathe and he could stay with the child. Vicente got there and we had dinner together as always, and so then I told him, I said I was [going] to take a bath and for him to watch the child, he said all right. I was bathing when I heard a thump and I heard the baby cry. I came out -- I stopped bathing and came out quickly because I wanted to know what had happened to the baby. When I got there, Vicente told me that he had gone to the room and that he had left the child on the love seat.
> . . . .
> He left the child on the love seat and the child had fallen from there. He told me that he had hit himself very hard on the table that's in front of the love seat . . . . He told me that he had gone to the room to get his cell phone quickly.

She described the victim as an "active child." The Defendant claimed that there were no "signs of any obvious injury" or she would have taken the victim to the hospital. The Defendant said that, after the fall, the victim was "crying a little bit[,]" she gave him a bottle, and "he calmed down." She believed that this head injury happened on Saturday, November 7.

The victim was "perfectly fine" throughout the evening following his fall, according to the Defendant. The next morning they followed their "normal routine[.]" Mr. Gonzalez

first noticed a lump on the victim's head that Sunday night when he was "playing rough" with the child. She had asked him to stop, but at one point, she left and went into the kitchen, leaving the victim alone with Mr. Gonzalez. The Defendant testified that Mr. Gonzalez called Vanderbilt "but a lady there told him that she couldn't give him any information because he's not the father." The Defendant said that Mr. Gonzalez was lying when he testified that he took the victim immediately to Vanderbilt Emergency Department upon noticing the lump.

According to the Defendant, she called Vanderbilt the following day, and "they told [her] they couldn't set up an appointment with [her] because [the victim] already had an appointment for his two-year exam." After one more day, she finally convinced someone at Vanderbilt to make her an appointment. The appointment was one more day after that, on Wednesday, November 11, and she kept that appointment. Mr. Gonzalez accompanied her and again instructed her on what to say to hospital personnel. According to the Defendant, Mr. Gonzalez told her "to say that the boy had fallen from the walker and that he had hurt himself with the table." She confirmed that the true story was the one she provided earlier in her testimony, that the child fell off the love seat. When DCS came to take her child, she did not speak up because she was fearful of Mr. Gonzalez.

Finally, the Defendant confirmed that the victim was frequently cared for by members of her family. However, she agreed that she was never informed of any injuries while the victim was in their care, only things like "he would throw himself backwards" during a fit. She also averred that the victim was never injured in her presence and that she never failed to seek treatment for any type of injury. She confirmed that the victim had not received any additional injuries since being removed from her care.

On cross-examination, the Defendant testified that, since November 2009, when the victim was removed from her custody, and until April 2011, when she was arrested on these charges, she continued to live with Mr. Gonzalez. He continued to beat hear, and she remained in fear. When asked where would she live if she regained custody of the victim, the Defendant stated that she did not "think" she would move back to Mr. Gonzalez's home, that she wanted to return to her parents' home. However, she then confirmed that, during her incarceration, she had reconciled with Mr. Gonzalez, whom she loved, and that he had visited her around fifty times and that they had possibly spoken "[h]undreds of times" on the telephone.

She acknowledged that she never came forward with these allegations about Mr. Gonzalez until mid-way through trial. She agreed that she frequently lied, including saying that Mr. Gonzalez was Jose Hurtado, but again claimed that she only did so because of her fear of Mr. Gonzalez. The Defendant agreed that, by covering for Mr. Gonzalez in October,

she allowed her son to be returned home with her and Mr. Gonzalez, even though she could have protected him by being truthful and allowing DCS to remove him then. Stated another way, the Defendant acknowledged that by lying she "put [her] son in harm's way again[.]"

The Defendant testified that Mr. Gonzalez began assaulting her about a month before she moved in with him. The Defendant claimed that, when she stayed at the home of her parents, who spent a large amount of time in Mexico, her sister Christina saw bruises that were inflicted by Mr. Gonzalez. She confirmed that, despite this violence, she moved in with Mr. Gonzalez anyway. According to the Defendant, Mr. Gonzalez threatened that, if she did not move in, then he would take her child from her. However, she was in fact fearful that he may start hitting the child once they lived together. The Defendant admitted that she stopped seeing the victim's biological father when he threatened to take the victim from her to Mexico. Also, the Defendant stated that Mr. Gonzalez hit her once in front of the victim.

The Defendant testified that her son had a high tolerance for pain. When asked how the victim received the additional fractures, the Defendant stated, "When one time when Vicente would grab him by his feet and he would be shaking him very hard." She claimed that the victim never limped. The Defendant denied ever hurting her son in any way. She confirmed that Mr. Gonzalez had not been charged with any of these crimes.

On redirect, the Defendant confirmed her belief that Mr. Gonzalez never intentionally hurt the victim. She hoped that he would have stopped playing rough with the child.

Sergio Hurtado, the Defendant's brother, testified that he and his wife had custody of the victim for almost three years by the time of trial, and he described the victim as a "very hyperactive child." The victim had not developed any additional injuries after being removed from the Defendant's care and placed with Sergio.

According to Sergio, when the Defendant had custody of the victim, the family regularly visited one another, and they often took the victim on outings. Sergio said that the Defendant "was always [a] very good mother" and that he allowed the Defendant to care for his daughter while he was at work. Sergio never observed any problems with the victim prior to the Defendant's moving in with Mr. Gonzalez.

Sergio's wife, Francisca Angel-Espindola, described the victim as "a very playful child, very naughty." She confirmed that the family was close and that they took the victim on outings when he lived with the Defendant. Ms. Espindola agreed that the Defendant was "a good mother[.]"

Ms. Espindola worked with the Defendant at Standard Candy Company. After the Defendant moved in with Mr. Gonzalez, she noticed that the Defendant became a "loner" while at work. Both Ms. Espindola and Sergio noticed a personality change in the Defendant during this time frame. According to Ms. Espindola, Mr. Gonzalez controlled the Defendant's money, and on one occasion, she witnessed a phone call between the Defendant and Mr. Gonzalez, when Mr. Gonzalez was verbally abusive to the Defendant. Ms. Espindola also saw bruises on the Defendant's hands one day at work, but this was after the victim had been removed from the Defendant's care.

Alexis Vasquez testified that he interpreted for a DCS case worker in October 2009 and that he was twelve or thirteen years old at the time. According to Alexis, he interpreted for the case worker both at the Defendant's home and at Vanderbilt. He stated that he had only been in this country for about three years and did not speak English well at that particular time. Alexis admitted that he gave different answers than these a week before when asked by the assistant district attorney general.

Jeannette Castro, Jose Hurtado's wife and the Defendant's sister-in-law, testified that the family was very close and spent frequent amounts of time together. She also described the victim as "very hyperactive." According to Ms. Castro, the Defendant provided good care for her son and often kept Ms. Castro's daughter. Although Ms. Castro never personally witnessed any domestic abuse, on multiple occasions, she went to pick up the Defendant after she had been abused by Mr. Gonzalez or kicked out of the house. Ms. Castro stated that she saw bruises on the Defendant's face, legs, and arms during these episodes. The Defendant mentioned Mr. Gonzalez's having a knife on one occasion, and according to Ms. Castro, the Defendant "was fearful" of Mr. Gonzalez. According to Ms. Castro, the Defendant was a "fun" and "happy person" prior to living with Mr. Gonzalez, and once the Defendant lived with Mr. Gonzalez, the family "hardly ever [saw] her." Ms. Castro said that, whenever Mr. Gonzalez was around the victim, the victim "totally changed."

On cross-examination, Ms. Castro acknowledged that she did not inform anyone of this abuse until after the State had closed its case-in-chief, when she called Ms. Menke around 8:45 in the evening. She also admitted that the Defendant never specifically told her that Mr. Gonzalez caused the victim's injuries; however, Ms. Castro asserted that she was "a hundred percent" sure that the Defendant was not the one who hurt the victim.

In rebuttal, the State called Emily Menke, a victim/witness coordinator for the district attorney general's office, who was assisting on this case because she spoke fluent Spanish. Ms. Menke confirmed that she received a call from Jeannette Castro following the close of the State's proof. Ms. Menke had also listened to recordings of conversations between the Defendant and Ms. Castro and also between the Defendant and Mr. Gonzalez. During the

conversation with Mr. Gonzalez, the couple continued to express their affection for one another. There was also discussion to the "effect" that they would get back together, including with the victim, if the Defendant was acquitted of these charges. They never discussed any physical abuse during this call, and the Defendant never suggested that Mr. Gonzalez was responsible for the victim's injuries.

Based upon the foregoing, the jury found the Defendant guilty as charged in counts one, three, four, and five, and guilty of the lesser-included offense of reckless aggravated assault in count two. The trial court sentenced the Defendant to twenty-five years for all convictions,[9] ordered the neglect conviction to merge with the "other counts," and ran the remaining sentences concurrently with one another. This appeal followed.

ANALYSIS

On appeal, the Defendant presents the following issues for our review: (1) whether the trial court committed plain error by failing to grant a mistrial given the "significant problems that arose during trial revealing the existence of potential new witnesses and exculpatory evidence"; (2) whether the trial court erred by permitting the State to elicit testimony about and argue that evidence of domestic violence against the Defendant at the hands Mr. Gonzalez established her guilty knowledge of the child abuse and neglect under a theory of criminal responsibility; and (3) whether the evidence was insufficient to support the convictions, including a challenge of material variance between the proof and the State's election of offenses. First, we find it necessary to provide some procedural history to place the Defendant's issues in their proper context. Then, we will address each argument in turn.

*I. Procedural History*

The jury left the courtroom for the day following the close of the State's proof and the election of offenses. Defense counsel moved for judgment of acquittal, arguing that the humerus injury was accidental, that the victim's other injuries could have been inflicted by another family member because the victim was not constantly in his mother's care, and that there was no delay in seeking medical treatment. However, that motion was denied. Defense counsel stated that the Defendant intended to testify in her own defense, alleviating the need for a <u>Momon</u> hearing. A discussion about the pending jury instruction ensued.

---

[9] The trial court sentenced the Defendant in count two for aggravated child abuse. However, as indicated, the Defendant was found not guilty of that charge and only guilty of the lesser-included offense of reckless aggravated assault. Therefore, we must remand this case for entry of a corrected judgment form for count two to reflect a conviction for reckless aggravated assault, a Class D felony, <u>see</u> Tennessee Code Annotated section 39-13-102, and we order a four-year sentence for that conviction. The Defendant's effective twenty-five-year sentence remains intact.

The prosecutor requested the inclusion of an instruction on criminal responsibility based upon testimony that Vicente Gonzalez was also an in-home caretaker for the child. The trial court noted that Mr. Gonalez was not indicted in this matter, to which the prosecutor responded,

> Typically that would be the case, we didn't anticipate some of the testimony that came out, which certainly would create one potential inference on the part of the jury that somebody's lying either because they are covering up for their own conduct, but the point being that they are in this together, that creates an issue of criminal responsibility, and the law with regard to fracture injury says essentially that whether the [D]efendant herself caused it or is participating in allowing that conduct to occur by somebody else and failing to act, that creates criminal responsibility, and the proof that establishes that opportunity is sufficient to support a finding of criminal responsibility, so.

The trial court stated that it agreed with the prosecutor's argument but again queried if it made any difference that Mr. Gonzalez was not indicted. The trial court further stated that if a criminal responsibility charge was given, then a charge on facilitation as a lesser-included offense would also be necessary. The trial court reserved ruling, told counsel to "[t]hink about it tonight" before the defense began its proof, and posed the following question: "is there evidence that would support the jury thinking that these crimes could have been perpetrated by Mr. Gonzalez, if there is evidence sufficient to submit to the jury for that consideration[?]"

The following proceedings were held in the judge's chambers the next morning. Defense counsel informed the trial court that Jeannette Castro telephoned him the night before "about a quarter to 9:00" p.m. According to defense counsel, Ms. Castro told him that "Vicente Gonzalez had approached her and some others, . . . about four or five people[,] and [Mr. Gonzalez] was apologetic and he stated specifically that he was the one that had injured the child and further that he had second thoughts about everything, and he was able to give specifics . . . . " Defense counsel stated that he intended to call Mr. Gonzalez back to the stand to testify regarding this new information, but the trial court indicated that Mr. Gonzalez would first have to be appointed a lawyer and that defense counsel could then speak with that attorney.

Ms. Menke, the victim/witness coordinator for the district attorney general's office, also received a call from Ms. Castro the previous evening at 8:42 p.m., which lasted for ten minutes according to Ms. Menke. Ms. Menke relayed the details of her conversation with Ms. Castro:

[Ms. Castro] did not indicate that she had spoken to Vicente, she said that in fact she was afraid he was going to run and that he might not show up to court today. She said that she had gone in the middle of the night previously to get [the Defendant] because [the Defendant] had been beaten up by [Mr. Gonzalez] and that she believed that [Mr. Gonzalez] was responsible for all of it and that he told [the Defendant] to be the one that spoke at the hospital because he didn't have papers and [the Defendant] does.

Ms. Castro conveyed to Ms. Menke during the call that Mr. Gonzalez had assaulted the Defendant, but she did not have "any direct knowledge that he assaulted the baby."

The discussion returned to the jury instructions in light of this new information. The prosecutor stated the following:

[I]t seemed apparent to me that the defense in this case was predicated on this being accidental injury and that the mother was not aware of any circumstance that would have caused any of these injuries to the child. I think it is apparent from our approach to this case that there were clearly two possibilities of who caused these injuries based on the circumstances, I considered this information from Ms. Castro to be potentially exculpatory information in one sense, i.e., it shows a person who's engaging in violent behavior with [the Defendant] and that [the Defendant] is potentially in fear of her own safety and that may be a reason for why she acts in the fashion she does. The flip side to that of course is that that gives her knowledge of the circumstances surrounding[] his potential for violence directed towards the child and her continuing to reside with him continuing to—

. . . .

Yes, based on assaults of her, and that her continuing conduct, allowing the baby to be around him and then concealing the fact afterwards creates other issues with regard to criminal responsibility.

Defense counsel stated that the prosecutor was correct that, "as of about a quarter to 9:00 last night I was totally unaware of any of this, hadn't even considered it." He continued, "Timing is interesting because" the calls were about the same, but he "hadn't even considered any of this, wasn't remotely aware of any of this[.]" The prosecutor confirmed that the State had only learned of this information the prior evening.

The trial court then stated that it was bound by the holding in State v. Gomez, 367 S.W.3d 237 (Tenn. 2012), that evidence of domestic abuse could not be used to establish the Defendant's guilty knowledge. However, the court then noted that the evidence could

possibly be used by the defense to establish a defense of duress—"I'm getting the hell beat out of me, what do you want me to do, I'm going to get killed if I report him and therefore it's an absolute defense[.]" Defense counsel noted that the prosecutor made a good point—that the abuse coincided with the Defendant's moving in with Mr. Gonzalez. The court then recessed, allowing defense counsel to speak with his client regarding this new information.

When court reconvened, defense counsel stated that, during the break, the State had provided him with recordings of telephone conversations between the Defendant and Mr. Gonzalez and also between the Defendant and Ms. Castro. The content of Mr. Gonzalez's statements on the recording were summarized: "at most Mr. Gonzalez says he'd be there for his wife and things of that nature, but there was nothing that was tantamount to a confession or things of that nature." On the recording between the Defendant and Ms. Castro, there were no representations made by either woman that the Defendant was "taking ownership for these incidents[.]" The parties often spoke "in code" on the calls, making references back and forth between each phone conversation and to courtroom officials, seemingly attempting to "manipulate the results of this trial." Moreover, Mr. Gonzalez's counsel, who had been appointed in the interim, indicated that, if Mr. Gonzalez was called to testify, then he would assert his Fifth Amendment right due to concerns of implicating himself of perjury.

Defense counsel asked for more time to review the tapes and discuss defense strategy with his client in order to avoid post-conviction proceedings in the future. The prosecutor stated,

> I have less concern about [defense counsel's] representation in this case than I have about the subordination [sic] of perjury with [defense counsel] as a conduit for some of this, and I'm not causing any aspersions on his conduct, I'm telling the [c]ourt that the manner in which these communications are communicated between family members is taking place in part based on conversations they're having with [defense counsel] and then using that to orchestrate testimony.

The trial court opined that may place defense counsel "in kind of ethical dilemma about whether or not he can even call [the Defendant] in light of the taped interviews" and the possible subornation of perjury. Ms. Castro was also appointed an attorney. The trial court granted defense counsel a continuance for the rest of the day to discuss defense strategy with his client and evaluate possible ethical issues. The jury was returned to the courtroom, and the trial court instructed them as follows:

Members of the jury, I am sure that you are frustrated, angry and probably full of questions, I can understand all of those feelings and I wish I were in a position to share with you why you haven't been in this courtroom yet today, but I am not in a position to do that. The only thing I can tell is that there is a matter that arose that is still being addressed, a matter that you are not to give any thought to or . . . concern yourself with, but this particular situation cannot be, we were hoping would have been resolved earlier this morning, but as we got into it further, it became more and more complex, but that matter has to be resolved before we can go any further with this trial. I have locked you up in a room all day, as it turns out, for no reason at all, and I'm not going to do it for the rest of the day. We're going to start back in the morning. You can be angry, you can be frustrated and you can be upset, okay, but whatever emotions you may have, take them out on the [c]ourt and not as to either one of these parties, okay, because it is not their fault that we are where we are. All right, so you cannot let this delay in any manner whatsoever affect the commitment that you've already made to be a fair and impartial juror and to ultimately render a verdict based solely on the evidence in this case and the law that applies to it. When and if this trial ever reaches a conclusion, and you have fulfilled your duties, I can assure you I will come back and give you a full explanation of everything that has occurred today so that hopefully you will better understand why we are in the posture that we're in at the moment, but I will do that. All I ask you to do is to please [bear] with us, and again, do what you have to do without any emotion or prejudice or passions because of this extraordinary, unfortunate, but absolutely unexpected delay, with that, I'm going to release you.

. . . .

Again, I apologize sincerely and we will be ready [to] go at 8:30 in the morning.

The jury was released for the day.

Counsel returned to the courtroom that afternoon. Defense counsel informed the court that he had clarified the information originally conveyed to him by Ms. Castro:

I've had the opportunity to sort it out, . . . and from what I have gathered, Mr. Gonzalez never spoke with Ms. Castro, he spoke with another family member, and in speaking with that family member, Mr. Gonzalez never indicated that he had done anything to injure the child, that more or less he was willing to do whatever was necessary to reunite the child and the mother together.

-27-

Mr. Gonzalez apparently spoke with Ms. Castro's husband, not Ms. Castro. Following this conversation between Mr. Gonzalez and Mr. Castro, Ms. Castro phoned defense counsel to inform him that Mr. Gonzalez said he was going to testify that he committed the abuse and would provide specifics, not that she had any direct knowledge of such or that Mr. Gonzalez had admitted such to her. Defense counsel clarified, "Not that [Mr. Gonzalez] told her, but that's what she represented to me, and that's how this whole snowball started rolling."

Defense counsel apologized to the court and queried about where he was "from an ethical standpoint[,]" making the following comments:

> Where does that put me as far as being able, even considering of everything else I've (inaudible), maybe I'd be seeking a mistrial, but I don't know how fortunate I would be, but it's just so much out there that I'm not in a very, very good position right now to, I don't believe, to be able to carry this through without it coming back on my head in some way, shape, form or fashion at some point in the future.

Defense counsel confirmed that no one would testify that Mr. Gonzalez ever made any admissions about abusing the victim; therefore, Ms. Castro would not be called to testify that Mr. Gonzalez ever made any admissions against his penal interest. The trial court opined, because no admission was ever made, then this was not a situation where defense counsel would potentially become a witness, having to clarify that "Miss So and So told me that Mr. Gonzalez told her this, now she's on the stand denying he ever told her that[.]" Thus, in the trial court's opinion, defense counsel was not now faced with any ethical dilemma in this regard, noting that the Defendant had a right to testify in her own defense even if she was perjuring herself and, if trial counsel felt that was the case, then he should have her testify in narrative form. The trial court further instructed that if trial counsel felt any other witnesses intended to perjure themselves, then he should not call them to the stand.

Discussion returned to the allegations of domestic abuse. The State noted that there still may be an ethical issue for defense counsel if Ms. Castro was called to the stand to testify about domestic abuse, defense counsel being "put in a position for possible impeachment" of Ms. Castro. The trial court asked defense counsel, "What about this issue of domestic abuse?" to which defense counsel said,

> That would have been there before, I don't want to show my hand at this point but there were some things that [the Defendant] through her family members -- . . . as things have developed, that I'm just not feeling awfully comfortable, . . . next thing you know I am up there and then I'm getting this funny letter [from] all these people, what I should not have done.

-28-

In an effort to avoid placing defense counsel in a comprising position, the trial court took an offer of proof of Ms. Castro's testimony regarding her knowledge of the domestic abuse. After hearing her testimony about the domestic abuse, including a thorough cross-examination, the trial court concluded, "I did not hear anything that directly or indirectly places [defense counsel] in jeopardy of a conflict arising, so she can be called as a witness."

As a final issue, the trial court referred to the Gomez case again. The trial court ruled that the State was precluded from "arguing that that domestic violence place[d] knowledge on [the Defendant] under criminal responsibility" but that the Defendant could introduce the evidence to support a duress defense. Put another way, "My ruling at this point in time is, there will be no reference of domestic violence until it's put before the jury by [the Defendant], until she puts it into play, it's not to be referenced by any other witness." The State was given permission to use the telephone conversation between the Defendant and Mr. Gonzalez as impeachment evidence, if she testified at trial regarding the abuse. The trial court stated that it would further consider, following the proof, the possibility that the State may argue guilty knowledge based on the domestic abuse if the Defendant raises the issue at trial. Proceedings were adjourned for the day, and trial resumed the following morning.

*II. Mistrial*

The Defendant concedes that she did not request a mistrial, but argues that she is entitled to plain error relief because the trial court should have sua sponte declared a mistrial "in light of significant problems that arose during the trial revealing the existence of potential new witnesses and exculpatory evidence[.]" See Tenn. R. App. P. 36; State v. Robinson, 971 S.W.2d 30, 42-43 (Tenn. Crim. App. 1997) ("[F]ailure to make a contemporaneous objection or motion for mistrial constitutes a waiver of the issue absent the existence of plain error."). The "newly discovered" evidence to which she cites is that "Vicente Gonzalez had physically, verbally and mentally abused the Defendant for a period of time including the time period leading up to and during the alleged crimes." The State contends that the Defendant cannot establish a claim for plain error relief because she waived the issue for tactical reasons and, moreover, because she has failed to establish a manifest necessity for a mistrial.

In order for this court to find plain error in the absence of an objection at trial, we consider the following five factors:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice.

-29-

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). Plain error cannot be found unless the record establishes all of the elements of the Adkisson standard. Id. at 283. In order for this court to reverse the judgment of the trial court, we must conclude that the error involved a substantial right and "more probably than not affected the judgment . . . ." Tenn. R. App. P. 36(b); State v. Yoreck, 133 S.W.3d 606, 611 (Tenn. 2004).

A mistrial should be declared only if there is a manifest necessity for such action. Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). A manifest necessity exists when there is "no feasible alternative to halting the proceedings." State v. Knight, 616 S.W.2d 593, 596 (Tenn. 1981). The burden of establishing a "manifest necessity" lies with the party seeking the mistrial. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). When determining whether a "manifest necessity" exists, "no abstract formula should be mechanically applied and all circumstances should be taken into account." State v. Mounce, 859 S.W.2d 319, 322 (Tenn. 1993) (quoting Jones v. State, 403 S.W.2d 750, 753 (Tenn. 1966)). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." Williams, 929 S.W.2d at 388. A trial court's decision regarding whether to grant a mistrial will only be overturned upon a showing of an abuse of discretion. Id.

The Defendant raised this issue for the first time in her motion for new trial. The trial court issued a written order on the motion for new trial, concluding therein that it did not err in failing to sua sponte declare a mistrial. In so holding, the trial court reasoned as follows:

> Although the Defendant cites to legal authority to support her argument (see, e.g., State v. Carter, 890 S.W.2d 449 (Tenn. Crim. App. 1994)), the facts in this case are distinguishable from Carter. In this case, there is no newly discovered evidence. [The Defendant] was the one person who had knowledge of this evidence from the very beginning. The fact that she chose, for whatever reason, not to divulge information does not change the fact that the evidence was not newly discovered. To agree with the Defendant's position on this issue would effectively allow every defendant the ability to control the trial of any case simply by changing defense theories if the evidence at trial is weighing against the defendant's interest. Moreover, even by [the Defendant's] own admission[,] only one sister had any knowledge of the alleged abuse and she testified to this fact at trial.

The "prosecution is not required to disclose information that the accused already possesses or is able to obtain." State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992).

We think it important to note at the outset of addressing this issue that counsel at the motion for new trial hearing and on appeal is not the same the attorney who represented the Defendant during her trial. Appellate counsel goes through great pains to argue that the information provided by the State on the morning after it closed it proof, i.e, evidence of domestic abuse from Jeanette Castro, was "newly discovered," "engendered confusion and uncertainty for the parties," created an "ethical dilemma" for defense counsel, and required a change in trial strategy midway through the trial, and therefore, the trial court should have sua sponte declared a mistrial.

The Defendant cites State v. Carter, 890 S.W.2d 449 (Tenn. Crim. App. 1994), as authority. In Carter, the trial court was faced with a series of complex problems. This was a death penalty case in which the jury had been sequestered. After hearing some testimony, the State suddenly found a newly discovered witness, Mr. Sneed, who was in the Shelby County Jail. Compounding the problem was another witness, Mr. Carrick, who had possession of a .380 caliber pistol, which was the murder weapon. Carter was represented by the Public Defender, whose office also represented both Mr. Sneed and Mr. Carrick. Defense counsel for Carter found newly discovered alibi witnesses. To further exacerbate problems, a bomb threat occurred to the building. As a result, the trial court, sua sponte, declared a mistrial in the interest of justice. On appeal, this court rejected the claim that a retrial following the mistrial was barred by principles of double jeopardy. Carter, 890 S.W.2d at 452-54.

We agree with the trial court and the State that this case is distinguishable from Carter. The Defendant sought to introduce in her defense evidence of the abuse inflicted on her by Mr. Gonzalez. Although the evidence may have been unknown to defense counsel prior to this time, the State is correct that any evidence of domestic abuse against the Defendant at the hands of Mr. Gonzalez was always within the realm of Defendant's knowledge. Therefore, the trial court correctly determined that this was not newly discovered evidence, and we agree that the fact that Defendant chose not to divulge this information does not make it newly discovered and that to permit such a practice would allow a defendant to highjack the trial if it was not going favorably.

The trial court also took an offer of proof to make sure that defense counsel was not, in fact, placed in an ethical dilemma. As the trial proceeded, defense counsel was never placed in a compromised position, i.e., where he needed to be called as a witness for impeachment purposes.

Contrary to the Defendant's assertion, the parties were not required to change entirely their respective trial strategies following this information from Ms. Castro. The State did not change its theory that the Defendant was the one who inflicted these wounds, and even prior

to this evidence coming to light, the State had requested an instruction on criminal responsibility based upon testimony that Mr. Gonzalez was also one of the victim's caretakers. It appears that the defense's initial strategy was that the injuries were accidental or committed by another family member. It does not appear that the defense abandoned that argument entirely[10] but provided the jury with an alternative explanation based upon the evidence of domestic abuse—that it was Mr. Gonzalez who inflicted these injuries and that the Defendant was afraid to come forward with this information. The State attempted to rebut the Defendant's theory of defense but was not required to entirely change its trial strategy contrary to the Defendant's assertion.

Also, there is no evidence that the Defendant would have been able to produce additional witnesses in support of this defense, although she avers that "she could have produced" "co-workers, a housemate, and a relative who had first-hand knowledge regarding these issues." As noted by the trial court, the only person who was aware of the domestic abuse, other than the Defendant, was called to testify at trial—Ms. Castro, a relative. Ms. Espindola, a relative and a co-worker, also testified to seeing the Defendant arrive at work with bruises on her body following the victim's removal, and stated that the Defendant became a "loner" at work. Both Sergio, the Defendant's brother, and Ms. Espindola testified to a personality change in the Defendant following her moving in with Mr. Gonzalez. Witnesses had already testified that they observed bruises on the Defendant, and her sister Christina, who lived at the Defendant's parents' house, would have only confirmed this. By the Defendant's own testimony, her sister Christina was unaware of any domestic abuse. The Defendant offers little evidence of what additional witnesses, even if produced at trial, may have added to this defense.

Allowing a mistrial would have additionally given the State time to prepare for a second trial; thus, defense counsel's decision to go forward was possibly tactical. Additionally, we note that the trial court gave the jury a lengthy instruction that it should not consider any delay in the proceedings to be the fault of either party and that, if blame was to be placed somewhere, then the jury should place it with the trial court.

It does not appear that "neither party had sufficient information to adequately assess the evidence of domestic violence[.]" We agree with the State that plain error does not provide the Defendant with relief—the Defendant caused the problems of which she complains; consideration of the error is not necessary to do substantial justice or protect a substantial right of the accused that was adversely affected; and the defense may have waived the issue for tactical reasons. This issue is without merit.

---

[10] Only the State's closing argument is transcribed.

### III. *Gomez* Material

The Defendant argues that "[t]he trial court erred in allowing the State to advance the theory that as a result of domestic violence suffered by the Defendant, she was therefore knowledgeable and criminally responsible for the abusive acts of Vicente Gonzalez, contrary to the holding in State v. Gomez." The Defendant first notes the trial court's familiarity with the "clear holding" in Gomez—that prior domestic abuse by one spouse against another did not make it more or less probable that the abused spouse intended to promote, assist or otherwise benefit from the abuse against the victim, and therefore, the evidence of domestic abuse was irrelevant and inadmissible by the State to establish the abused spouse's guilty knowledge under a theory of criminal responsibility. See State v. Gomez, 367 S.W.3d 237, 243-45 (Tenn. 2012). She continues that the trial court, nonetheless, still permitted, in error, the State to elicit "testimony from the Defendant about the domestic abuse specifically arguing that she was knowledgeable as to the possibility that Vicente Gonzalez would hurt the victim" and further to "advance[] the theory both during closing argument and at the sentencing hearing." The State responds that this case is distinguishable from Gomez, because it was the Defendant, not the State, that sought admission of the evidence and because the Defendant here, unlike in Gomez, knew that Mr. Gonzalez was abusing the child and took active measures to assist in a cover-up.

Initially, we must address an additional argument made by the State on appeal—that a change in the child abuse statutes renders Gomez inapplicable. See Gomez, 367 S.W.3d at 244 (noting that child abuse statutes had since been amended to include child endangerment). While it is true that the child abuse statutes were amended in 2009 to include a manner of guilt by child endangerment, a theory of endangerment was never charged to this jury. The State made no objection or request for its inclusion at trial and did not raise this argument in response to the Defendant's allegation in the motion for new trial. The State raises this argument for the first time on appeal. For these reasons, we will not analyze any of the Defendant's convictions under a theory of child endangerment. See Tenn. R. App. P. 36(a) (stating that relief on appeal is generally not available where a party is "responsible for an error" or has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error").

At the motion for new trial hearing, the trial court ruled on the Defendant's Gomez issue as follows:

> The trial court did not err in instructing the jury on the legal principles of criminal responsibility for the conduct of another and facilitation. Admittedly, State v. Gomez, . . . held that giving such an instruction is reversible error when the only evidence in the record to support the instructions was the abuse perpetrated upon Ms. Lopez by Mr. Gomez. There

was no evidence that Mr. Gomez had ever done anything to hurt the child. In fact, Ms. Lopez opined that Mr. Gomez was not capable of hurting the child.

However, the evidence in this case was not limited to spousal abuse. [The Defendant], although never labeling Vicente Gonzalez's interaction with the child as abuse, repeatedly claimed that Mr. Gonzalez played rough with the child and that she often would attempt to make him stop. She put forth this testimony in an attempt to portray Mr. Gonzalez as the perpetrator of the child's injuries. Based on this evidence, the jury instruction was proper because there clearly was evidence presented from which a jury could conclude that [the Defendant] knew of the abuse. It was appropriate; therefore, for the jury to decide if this evidence rose to the level of either criminal responsibility or facilitation, assuming the jury accredited her testimony.

We agree with the trial court that <u>Gomez</u> is readily distinguishable from the present case because it was the Defendant who sought to admit the evidence of domestic abuse to establish a defense of duress. This defense is governed, in relevant part, by Tennessee Code Annotated section 39-11-504(a), which states as follows:

> Duress is a defense to prosecution where the person or a third person is threatened with harm that is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh the harm sought to be prevented by the law proscribing the conduct, according to ordinary standards of reasonableness.

An instruction on this defense was given to the Defendant's jury at the defense's request. If admissible evidence supporting a duress defense is introduced, the State must negate the defense beyond a reasonable doubt before the defendant may be convicted. Tenn. Code Ann. § 39-11-201(a)(3).

In <u>Gomez</u>, the court held that the defendant in that case had not "opened the door" to the inadmissible evidence. At the Defendant's trial, the jury was instructed on duress and told that if evidence was introduced supporting the defense of duress, the State had the burden to rebut the defense beyond a reasonable doubt and that any reasonable doubt on the issue of whether the Defendant acted under duress required her to be found not guilty. Even if evidence is inadmissible, a party may "open the door" to admission of that evidence.

-34-

Gomez, 367 S.W.3d at 246. "When a party raises a subject at trial, the party 'expand[s] the realm of relevance,' and the opposing party may be permitted to present evidence on that subject." Id. (quoting 21 Charles Alan Wright, et al., Federal Practice & Procedure Evidence § 5039.1) (additional citation omitted). We think it clear that the Defendant opened the door to this evidence by presenting evidence of the domestic abuse and by raising duress as a defense. The Defendant also engaged in multiple lies to cover up any abuse or neglect by her or Mr. Gonzalez, lying to doctors, hospital staff, social workers, and Det. Long, and providing implausible explanations for the victim's injuries, and frequently lying about Mr. Gonzalez's identity. The Defendant herself placed her knowledge of the abuse and neglect into question. Surely, this opened the door and allowed that State to pose questions and make any arguments about the inferences of domestic abuse, including as it related to the State's theory of criminal responsibility. See Gomez, 367 S.W.3d at 243-48. This issue is without merit.

### IV. Sufficiency of the Evidence

The Defendant argues that the evidence is insufficient to sustain her convictions for aggravated child abuse, reckless aggravated assault, and aggravated child neglect.[11] Her argument is simply that "[t]he evidence advanced by the State at trial does not support such a verdict, but rather weighs towards the conclusion that Vicente Gonzalez committed the abuse and that the Defendant was not criminally responsible for such actions."

In a related argument, the Defendant contends that "[t]here was a material and substantial variance between the proof adduced at trial and the [e]lection of [o]ffenses relied upon by the State[.]" Her argument in this regard is that the State failed to put on any proof that the Defendant was responsible for "causing" the ulna and tibia fractures to the victim, counts two and three. She notes that there was testimony that the child was not always in her care and contends that the "State relies solely on testimony about how the injuries hypothetically could have" occurred.

The State responds that the evidence is sufficient to sustain all of the Defendant's convictions. The State correctly notes that the Defendant does not dispute that the abuse and neglect occurred but only submits that she was not culpable for the offenses. According to the State, the jury, consistent with its prerogative, chose not to credit the Defendant's testimony. As the Defendant was a primary caretaker for the child, she admitted to being

---

[11] She also argues this issue in terms of the trial court's duty to act as the thirteenth juror. This court has observed that once the trial court has approved the verdict as the thirteenth juror, as it did specifcially in this case, our appellate review is then limited to determining the sufficiency of the evidence. See State v. Burlison, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993).

present when each of the injuries occurred, a substantial delay in treatment was shown, and there were multiple inconsistencies in the Defendant's testimony.

The indictment in this case charged four counts of aggravated child abuse committed between October 1, 2009, and November 11, 2009. The counts did not provide any additional specifics about the abuse, and such was not legally required. Count five charged aggravated child neglect within this same time period. The Defendant filed a motion for a bill of particulars, although a response is not included in the technical record. The State's election of offenses at trial is outlined in the factual section above. The Defendant was convicted as charged of aggravated child neglect and of aggravated child abuse for the humerus, tibia, and skull fractures. She was found guilty of the lesser-included offense of reckless aggravated assault for the ulna fracture.

A variance between information in the indictment and the evidence presented at trial is fatal in Tennessee only if the variance is "material" and "prejudicial" to the defendant. State v. Moss, 662 S.W.2d 590, 592 (Tenn. 1984). "Material" means that an essential element of the charge is lacking, such that the allegations and proof do not correspond substantially. See id. "Prejudicial" means a substantial right has been affected: either the defendant was misled at trial and could not prepare a defense or is exposed to a risk of double jeopardy. Id. As our supreme court stated, a variance is not material or prejudicial when "the allegations and proof substantially correspond, the variance is not of a character which could have misled the defendant at trial and is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." Id.

Although stated as a "variance" issue, the nature of the Defendant's complaint is really that the evidence is not sufficient to support the offenses elected in counts two and three. The case before us does not present a variance issue, but only a challenge to the sufficiency of the convicting evidence. See, e.g., State v. Fred Chad Clark, II, No. M2010-00570-CCA-R3-CD, 2012 WL 3861242, at *22 (Tenn. Crim. App. Sept. 6, 2012) (holding that no variance issue was presented by defendant's argument that there was a material variance between the proof and the State's election of offenses), aff'd, State v. Clark, -- S.W.3d --, No. M2010-00570-SC-R11-CD, 2014 WL 5801658 (Tenn. Nov. 10, 2014).

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571

S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

At the time these offenses were committed and as charged to this jury, the statute defined aggravated child abuse and neglect[12] as follows: "A person commits the offense of aggravated child abuse [or] aggravated child neglect . . . , who commits child abuse, as defined in § 39-15-401(a)[, or] child neglect, as defined in § 39-15-401(b); . . . and . . . [t]he act of abuse [or] neglect . . . results in serious bodily injury to the child[.]" Tenn. Code. Ann. § 39-15-402(a)(1). "Child abuse" is committed by "[a]ny person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury [.]" Tenn. Code Ann. § 39-15-401(a). "Child neglect" is committed by "[a]ny person who knowingly abuses or neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare." Tenn. Code Ann. § 39-15-401(b). To convict the Defendant of reckless aggravated assault, the jurors here were required to find beyond a reasonable doubt, that the Defendant recklessly assaulted the victim and caused serious bodily injury. See Tenn. Code Ann. §§ 39-13-101, -102.

"A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). As relevant here,

---

[12] We omit any reference to child endangerment because, as stated above, such a theory of guilt was not charged to this jury. Additionally, this case was aggravated solely based upon the alleged serious bodily injury to the child, and only this avenue was charged to the jury. See Tenn. Code. Ann. 39-15-402(a)(2)(3) (providing two additional avenues for the crimes to be aggravated in nature).

A person is criminally responsible for an offense committed by the conduct of another, if:

. . . .

(2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense; or

(3) Having a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist its commission, the person fails to make a reasonable effort to prevent commission of the offense.

Tenn. Code Ann. § 39-11-402(2), (3). Criminal responsibility is not a separate crime; rather, it is "solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999). To prove guilt through a theory of criminal responsibility the State must establish that the defendant "'knowingly, voluntarily and with common intent unite[d] with the principal offender[] in the commission of the crime.'" State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)).

Here, the trial court made the following findings regarding the Defendant's material variance and sufficiency issues:

The evidence presented at trial is not at variance with the election of offenses. The Defendant is correct that the child was occasionally left in the custody of the other family members. However, there was absolutely no evidence that any injuries occurred to the child on these occasions. To suggest otherwise would be pure speculation. Further, [the Defendant] herself gives several explanations as to how the injuries might have occurred and on each occasion she admittedly had sole custody of the child.

The court does not find that a review of the totality of the evidence adduced at the trial warrants the exercise of its authority as the thirteenth juror. The court listened closely to all of the testimony, took copious notes, and evaluated the credibility of witnesses. The court found the numerous inconsistencies in [the Defendant's] testimony to be significant and her explanation of them to be less than compelling. Even if you were to accept her testimony at face value, the evidence would still support her convictions under the theory of criminal responsibility.

We again agree with the trial court.

The State presented three doctors, all of whom opined that the victim's four fractures were the result of non-accidental trauma, and Drs. Green and Bracikowski agreed that they were caused by different mechanisms at different times. Although Dr. Green at first determined that the humerus fracture was accidental, he later revised that opinion in light of the additional evidence gathered since his initial evaluation on October 28, 2009, and his subsequent conclusion of non-accidental trauma causing the humerus fracture was supported by the testimony of Drs. Carroll and Bracikowski. Dr. Carroll agreed that, if the humerus injury happened the day before the victim was brought to Southern Hills Hospital at 2:00 p.m., the approximately twenty-four-hour delay in seeking treatment for that injury was an indicator of abuse. The Defendant admitted that she was alone with the victim when this injury occurred. According to the doctors, the humerus fracture likely would have caused immediate pain, even screaming by the victim; the victim would have been unable to use his arm normally and "[a]ny motion of that arm [would] cause significant pain" until the arm was immobilized. Dr. Green stated that "a fair amount of force was needed "to cause [this] particular injury[.]" Both Dr. Bracikowski and Dr. Green stated that this fracture was unlikely to be caused by a child of the victim's age falling on an outstretched arm but, according to Dr. Green, was rather consistent with someone grabbing the child's arm and twisting violently.

By the Defendant's own admission, the head injury to the victim happened on Saturday, November 7, and the victim was not seen at Vanderbilt Children's Hospital until Wednesday, November 11. Medical imaging performed on November 11 revealed a recent, bilateral skull fracture, and two older fractures to the tibia and ulna, which were both in different stages of healing. Dr. Green opined that the ulna fracture was more than two weeks old at the time of the skeletal survey, while the tibia fracture was more recent, although at least seven days old, and both were older than the skull fracture in Dr. Green's opinion. Dr. Green stated that both these injuries would have caused the victim pain. The Defendant was unable to provide any explanation for the ulna or tibia fracture on November 11; however, during her testimony she recounted an incident of "rough play" by Mr. Gonzalez, which she believed caused these fractures. Dr. Bracikowski opined that the ulna fracture was a "defensive wound" caused by force and that the victim would have been limping, with obvious signs of pain, due to the tibia fracture. She concluded that the tibia and ulna fractures were the result of abuse, mainly because they were unexplained and untreated.

The skull fracture was described as "a nasty fracture[,]" beginning on the right side of the skull and crossing the suture line to the opposite side of the head. The Defendant admitted that she was present in the house when the head injury occurred. Bleeding between the victim's skull and his brain, an epidural hemorrhage, was also apparent, and an injury of

that nature is "dangerous and life-threatening" according to Dr. Brackiowski. Dr. Bracikowski opined that a tremendous amount of force must have been delivered bluntly to the child's head to cause a fracture of this kind and that the victim would have been in a tremendous amount of pain. Dr. Green stated that it took a "fairly significant blow" to cause this fracture. Dr. Carroll stated that the Defendant's explanation of the head injury was unreasonable. The doctors also testified that scalp swelling would have started almost immediately and that any caretaker would have been aware that the child was in pain and sought medical care as a result. The delay in treatment, from November 7 to November 11, also factored in to the conclusion that the fracture was the result of non-accidental trauma.

Additionally, all of the victim's injuries occurred within a very short time frame, and the Defendant and Mr. Gonzalez were the victim's primary caretakers. Both the Defendant and Mr. Gonzalez stated that the humerus fracture occurred while Mr. Gonzalez was at work and the Defendant was alone with the victim. To the extent that the defense showed that other family members kept the child, there was no proof that any injury occurred to the child while in someone's else care.

As noted by the trial court, the Defendant's credibility was seriously called into question, as was Mr. Gonzalez's. They gave multiple, inconsistent accounts for the causes of the victim's injuries, frequently lying to hospital personnel, doctors, social workers, and the police. They lied about Mr. Gonzalez's identity and where the child lived. The testimony of hospital personnel, doctors, social workers, and the police regarding the presence of an interpreter and their ability to comprehend and understand the conversations with the Defendant and Mr. Gonzalez differed greatly from the testimony of Mr. Gonzalez and the Defendant. If Mr. Gonzalez was the perpetrator as the Defendant asserts, the Defendant assisted him by covering up the abuse and failing to seek medical care, supporting a theory of guilt by criminal responsibility. Moreover, Mr. Gonzalez frequently visited the Defendant while she was incarcerated, and they spoke often, including discussing plans of reconciliation and returning home with the victim if the Defendant was to regain custody. Juries are tasked with assessing the credibility of trial witnesses and are generally free to reject, in whole or in part, the testimony of any witnesses. As often stated, it is the province of the jury to assess the credibility of the witnesses, weigh the evidence, and resolve disputed issues of fact. State v. Leach, 148 S.W.3d 42, 53 (Tenn. 2004).

Accordingly, the evidence was sufficient for the jury to conclude that either the Defendant or Mr. Gonzalez, for whom the Defendant was criminally responsible, caused the victim's fractures to his skull, ulna, tibia, and humerus bones. Thus, the three counts of aggravated child abuse and one count of reckless aggravated assault are supported by sufficient evidence. Moreover, there was sufficient proof that the Defendant or Mr. Gonzalez, or both, failed to seek timely treatment for each of the four fractures, possibly

causing further harm and great pain to the victim, thus, supporting her conviction for child neglect.  The Defendant is not entitled to relief.

## CONCLUSION

In accordance with the foregoing reasoning and authorities, the judgments of the trial court are affirmed.  However, we must remand the case for a corrected judgment form in count two to properly reflect the jury's verdict of reckless aggravated assault and for imposition of the maximum four-year sentence for that conviction.


_____

D. KELLY THOMAS, JR., JUDGE